UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

MARIO ROJO,

        Plaintiff,

v.                       Case No. 8:15-cv-1982-T-33JSS

SCOTT HOLDERBAUM, et al.,

        Defendants.
_____/

**ORDER**

This matter comes before the Court upon Defendants Sergeant Scott Holderbaum and Sheriff Bob Gualtieri's Motion for Summary Judgment (Doc. # 46), filed on September 28, 2016. Plaintiff Mario Rojo filed a response in opposition on October 31, 2016. (Doc. # 48). Defendants filed their reply on November 14, 2016. (Doc. # 49). For the reasons stated herein, the Court grants the Motion; specifically, the Court grants summary judgment in favor of Holderbaum as to Count I of the Amended Complaint and the Court dismisses Counts II and III of the Amended Complaint.

## I.   **Background**

This § 1983 excessive force action arises from a single, closed fist punch delivered by Holderbaum during a strip search of Rojo during the latter's booking into the Pinellas

County Jail. (Doc. # 46-4, Rojo Depo., at 27:5-11). On December 20, 2011, Rojo attended a college football bowl game at Tropicana Field located in St. Petersburg, Florida. (<u>Id.</u> at 7:16-24). The game was scheduled to start at 8:00PM. (<u>Id.</u> at 29:3-6). Before the game, Rojo started tailgating at 3:00PM, during which time he consumed between nine and ten Cable Car Beers. (<u>Id.</u> at 40:18-42:10). Rojo also consumed three to four Jell-O shots at the tailgate. (<u>Id.</u> at 43:4-13). Rojo then began to walk into the stadium and drank an unknown amount of vodka during the walk. (<u>Id.</u> at 43:14-22).

In the first half of the football game, Rojo ordered a "stiff drink," which was a Johnny Walker Black on the rocks. (<u>Id.</u> at 43:23-44:5). The game continued and, at half-time, Rojo encountered his cousin in the men's restroom. (<u>Id.</u> at 45:4-8). Rojo planned with his cousin to sneak into the VIP section, where his cousin was sitting. (<u>Id.</u> at 45:9-12). As Rojo attempted to sneak into the VIP section, an usher or security guard stopped him. (<u>Id.</u> at 45:13-19). Although Rojo does not remember what he told the usher exactly, he does remember that "it wasn't very polite." (<u>Id.</u> at 45:20-46:17). The verbal exchange led to the usher summoning the police to eject Rojo from the stadium; Rojo has been permanently banned

from Tropicana Field as a result of the preceding incident. (<u>Id.</u> at 46:18-25).

As two officers with the St. Petersburg Police Department escorted Rojo out of the stadium, Rojo shoved one of the officers. (<u>Id.</u> at 47:1-48:2, 48:14-16). As a result, Rojo was arrested for battery on a law enforcement officer. (<u>Id.</u>). Although Rojo denies shoving one of the officers and the charge was later reduced to disorderly conduct, to which Rojo pled no contest (<u>Id.</u> at 47:17-48:13), Rojo does not challenge the constitutionality of his arrest by the St. Petersburg Police officers, nor is he suing either officer in this action. After his arrest, Rojo was transported to the Pinellas County Jail. (<u>Id.</u> at 8:13-15, 48:20-22).

On the night Rojo was booked into the Pinellas County Jail, Deputy James Thorn, a non-party, was on duty with the Central Division, Intake Receiving squad. (Doc. # 46-5, Thorn Depo., at 9:13-25, 10:19-22). Thorn reported to Holderbaum, who was the sergeant in charge of Intake Receiving (Doc. # 46-3, Holderbaum Depo., at 12:11-13:3), and Holderbaum reported to Lieutenant Phillipson. (<u>Id.</u> at 14:7-12; Doc. # 46-5, Thorn Depo., at 10:25-11:5, 11:18-20). Holderbaum was assisting in Intake Receiving on the night of December 20,

2011, and the early morning of December 21, 2011, because the Jail was busy. (Doc. # 46-3, Holderbaum Depo., at 14:13-16).

When Rojo was brought into Intake Receiving, the first step of the booking process was to have a facial recognition photograph taken so that Jail staff could determine if he had been previously booked in the Jail. (Doc. # 46-5, Thorn Depo., at 12:2-7). During this process, however, Rojo "was argumentative" and "did not want to get his picture taken." (Id. at 12:6-7); see also (Id. at 13:5-11). Eventually, Rojo's facial recognition picture was taken. (Id. at 14:2-4). Then, because of Rojo's charge—battery on a law enforcement officer, which is a felony offense in Florida—a strip search was to be conducted. (Id. at 14:5-9, 16:14-16, 17:5-13; Doc. # 46-4, Rojo Depo., at 47:1-48:2, 48:14-16; Doc. # 46-3, Holderbaum Depo., at 15:18-16:10).

To conduct a strip search, at least two deputies of the same gender as the person being searched must be present. (Doc. # 46-5, Thorn Depo., at 19:3-5). Thorn was one of the deputies who conducted the strip search of Rojo (Id. at 19:8-10), and Thorn asked Holderbaum to assist in the strip search (Doc. # 46-3, Holderbaum Depo., at 14:16-17); see also (Doc. # 46-5, Thorn Depo., at 19:12-17). When Holderbaum arrived to assist Thorn, Rojo asked where he was being taken, whereupon

4

Holderbaum explained that Rojo was being taken to be strip searched. (Doc. # 46-3, Holderbaum Depo., at 15:18-20, 17:9-18:10; Doc. # 46-4, Rojo Depo., at 74:21-75:23). Rojo does not remember what response he received, if any. (Doc. # 46-4, Rojo Depo., at 76:5-8). Rojo does remember, however, that after entering the cell to be strip searched, but before being instructed to remove his first article of clothing, either Holderbaum or Thorn "were commenting on [Rojo's] ethnicity, and that . . . [he] was from Miami . . . .[;] their exact words were, like, something like, [']we got another one of these Miami spicks,['] you know, something along those lines." (Id. at 63:12-65:15). Holderbaum denies such a comment was made. (Doc. # 46-3, Holderbaum Depo., at 28:7-10).

With respect to the strip search itself, Rojo testified during his deposition that it is fair to say he does not have any memory of whether he took off all his clothing at once or if he took off the clothing article by article and the order in which he disrobed. (Doc. # 46-4, Rojo Depo., at 12:17-13:18). When questioned further, though, Rojo testified as follows:

> Q    All right. Coming down to 19. After Plaintiff was directed to remove his pants, he did so. I think you testified that that's accurate --

```
A    Right.
Q    -- correct?
A    Correct.
Q    All right. And then you dropped your pants to
the floor. That's accurate?
A    That's accurate.
Q    All right. And then Defendant Holderbaum
directed you to pick the pants up from the floor.
That's accurate, correct?
A    Yes.
Q    All right. And then to hand the pants to him.
A    Okay.
Q    Is that correct?
A    I can agree with that.
Q    Okay. And you did hand the pants to him,
correct?
A    Correct.
Q    Okay. And then you were directed to remove
your boxer shorts, correct?
A    Correct.
Q    You removed the boxer shorts to your feet, and
then kicked them towards Sergeant Holderbaum,
correct?
A    Correct.
Q    And in response, Sergeant Holderbaum punched
you once in the face, correct?
A    Correct.
Q    All right. Now, when you kicked the boxer
shorts towards Sergeant Holderbaum, and he then
struck you in response to that in the face, once,
you were not in handcuffs, correct?
A    I was not.
Q    Okay. You weren't in any kind of shackles, or
anything like that, right?
A    I was not.
Q    Okay. You weren't secured or restrained in any
way, were you?
A    No.
```

(Id. at 17:3-18:19). Although Rojo differentiates between the

action of kicking his boxer shorts at Holderbaum and his

underlying intent, Rojo agrees he did, in fact, kick his boxer shorts at Holderbaum. (Id. at 19:16-22:6).

Holderbaum's and Thorn's deposition testimony of the above-recounted portion of the strip search is consistent with Rojo's testimony. Neither Holderbaum nor Thorn remembers which article of clothing (his shirt or his pants) Rojo removed first. (Doc. # 46-3, Holderbaum Depo., at 19:24-20:2; Doc. # 46-5, Thorn Depo., at 23:19-22, 24:16-18). When Holderbaum ordered Rojo to remove his first article of clothing and hand it to Thorn, Rojo failed to comply. (Doc. # 46-3, Holderbaum Depo., at 19:11-19). Rather, Rojo removed the article of clothing, looked at Thorn, extended his arm, and dropped the article on the floor. (Id. at 19:20-23; Doc. # 46-5, Thorn Depo., at 24:19-25:14). Holderbaum ordered Rojo to pick up the article of clothing and hand it to Thorn; Rojo complied with the second command. (Doc. # 46-3, Holderbaum Depo., at 20:13-20; Doc. # 46-5, Thorn Depo., at 25:15-18).

After an article of clothing was removed and searched, Holderbaum would order Rojo to remove another article of clothing to be searched. (Doc. # 46-3, Holderbaum Depo., at 20:21-24). This process continued until Rojo was wearing only boxer shorts. (Id. at 20:24-21:4); but see (Doc. # 46-5, Thorn Depo., at 25:16-25) (indicating the article of clothing that

Rojo dropped on the floor was removed just before Rojo kicked his boxer shorts at Holderbaum).

Once Rojo was wearing only boxer shorts, Holderbaum ordered him to remove them. (Doc. # 46-3, Holderbaum Depo., at 21:3-9; Doc. # 46-5, Thorn Depo., at 25:2-4, 25:23-24). Rojo removed the boxer shorts so that they were resting around his ankles/feet. (Doc. # 46-3, Holderbaum Depo., at 21:10-14; Doc. # 46-5, Thorn Depo., at 25:24-25). Then, Rojo paused and looked at Holderbaum. (Doc. # 46-3, Holderbaum Depo., at 21:6-7, 21:12-13). Holderbaum directed Rojo not to kick the boxer shorts at him. (Id., at 21:15-16). But, Rojo ignored Holderbaum's directive and, from about three to five feet away, Rojo kicked his boxer shorts at Holderbaum while yelling "fuck you." (Id. at 22:3-7; Doc. # 46-4, Rojo Depo., at 72:17-73:24; Doc. # 46-5, Thorn Depo., at 25:25-26:21). The boxer shorts hit Holderbaum on the right side of his waist. (Doc. # 46-3, Holderbaum Depo., at 22:8-12; Doc. # 46-5, Thorn Depo., at 26:22-27:2). And then, Rojo stepped toward Holderbaum. (Doc. # 46-3, Holderbaum Depo., at 30:24-31:2, 32:1-9, 38:3-7; Doc. # 46-5, Thorn Depo., at 46-5, at 27:3-12).

Holderbaum immediately reacted—punching Rojo once in the face with a closed fist. (Doc. # 46-3, Holderbaum Depo., at

8

22:13-20; Doc. # 46-5, Thorn Depo., at 27:13-21). Rojo lost consciousness for an unspecified period of time after being struck in the face. (Doc. # 46-4, Rojo Depo., at 23:1-4). As Rojo moved backwards from the force of the blow, Holderbaum immediately placed his arm across Rojo's chest and applied forward pressure, pinning Rojo's back up against the cell wall. (Doc. # 46-3, Holderbaum Depo., at 23:3-16, 23:22-24:1; Doc. # 46-5, Thorn Depo., at 29:8-24). Thorn stepped in at this point and grabbed Rojo's legs in an effort to control Rojo. (Doc. # 46-3, Holderbaum Depo., at 24:8-10; Doc. # 46-5, Thorn Depo., at 29:25-30:5, 31:8-11). Although Rojo initially resisted, Holderbaum and Thorn were able to gain control, and laid Rojo face-up on the concrete bench in the cell. (Doc. # 46-3, Holderbaum Depo., at 24:2-25:8; Doc. # 46-5, Thorn Depo., at 30:5-22). Other deputies, hearing the commotion, responded to the cell. (Doc. # 46-3, Holderbaum Depo., at 26:18-20; Doc. # 46-5, Thorn Depo., at 31:12-32:2).

Around this point in the sequence of events, Rojo regained consciousness. (Doc. # 46-4, Rojo Depo., at 25:1-9). Holderbaum, Thorn, and the responding deputies then moved Rojo to the floor and laid him face-down. (Doc. # 46-3, Holderbaum Depo., at 24:16-20, 26:7-13; Doc. # 46-5, Thorn Depo., at 32:3-6). Rojo continued to resist the efforts of

the deputies to secure him by bracing and tensing in an attempt to prevent handcuffs from being placed on him. (Doc. # 46-5, Thorn Depo., at 32:17-33:1). At that point, an unidentified responding deputy conducted a "show of force" by placing a Taser against Rojo's leg; Rojo was not tased. (Id. at 33:2-12). The show of force was effective, and Rojo became compliant. (Id. at 33:13-14). After Rojo was handcuffed and secured, Phillipson, the lieutenant in charge that evening, decided that Rojo would be placed in the prostraint chair. (Id. at 34:25-35:10). When a person is placed in the prostraint chair, their arms and legs are strapped to the chair so that they cannot be moved. (Id. at 35:11-13).

Before he was placed in the prostraint chair, a nurse with the Jail's medical staff examined Rojo. (Id. at 37:7-16); see also (Doc. # 46-3, Holderbaum Depo., at 44:13-18). The nurse indicated that Rojo's nose was broken, but otherwise did not indicate immediate medical attention was required. (Doc. # 46-4, Rojo Depo., at 68:11-23, 80:18-81:3). Rojo was also bleeding as a result of Holderbaum's punch. (Doc. # 46-3, Holderbaum Depo., at 25:4-8; Doc. # 46-5, Thorn Depo., at 34:3-9).

A pair of pants was placed on Rojo, he was shackled, strapped into the prostraint chair, and placed into a secure

10

cell. (Doc. # 46-5, Thorn Depo., at 32:9-16). A spit-mask was also placed on Rojo's face because "as he was yelling and screaming at everyone, the blood was going down onto his lips. And as he was yelling, it was – it was spraying out." (Id. at 35:15-20); see also (Doc. # 46-3, Holderbaum Depo., at 26:25-27:1; Doc. # 46-4, Rojo Depo., at 81:4-18). Holderbaum's interactions with Rojo ceased after Rojo was placed into the prostraint chair. (Doc. # 46-3, Holderbaum Depo., at 44:8-10).

Eventually, Rojo was released from the prostraint chair, and the strip search was completed. (Doc. # 46-5, Thorn Depo. at 39:12-40:3). Holderbaum did not participate in the second strip search. (Id. at 39:16-17, 39:24-40:3). After the strip search was completed, Rojo was taken to Intake Processing, the next step of the booking process. (Id. at 40:24-41:6). Rojo later bonded out of jail and drove back to Miami, Florida, on December 21, 2011. (Doc. # 46-4, Rojo Depo., at 28:20-29:15).

When he returned to Miami, Rojo was examined by a doctor, who diagnosed Rojo as suffering from a comminuted fracture of the left anterior maxillary sinus wall. (Id. at 30:2-8). Rojo underwent surgery to correct the fracture. (Id. at 30:9-11).

On August 26, 2015, Rojo instituted the present action by filing a Complaint in this Court. (Doc. # 1). Upon the Defendants' motions to dismiss (Doc. ## 7, 10), and after receiving Rojo's responses thereto (Doc. ## 16-17), the Court dismissed the Complaint with leave to amend. (Doc. # 18). Rojo filed his Amended Complaint on October 21, 2015. (Doc. # 20). The Amended Complaint asserts three counts: a § 1983 claim against Holderbaum for excessive force (Count I); a battery claim against Holderbaum under Florida state law (Count II); and a battery claim against Gualtieri, in his official capacity as Sheriff of Pinellas County, which is pled in the alternative to Count II (Count III). Defendants filed their pending Motion on September 28, 2016, Rojo responded, and Defendants replied. (Doc. ## 46, 48-49). The Motion is ripe for review.

## II.  Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute alone is not enough to defeat a properly pled motion for summary judgment; only the existence of a genuine issue of material fact will preclude

a grant of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (citing Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 918 (11th Cir. 1993)). A fact is material if it may affect the outcome of the suit under the governing law. Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997). The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Hickson Corp. v. N. Crossarm Co., Inc., 357 F.3d 1256, 1260 (11th Cir. 2004) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). "When a moving party has discharged its burden, the non-moving party must then 'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995) (citing Celotex, 477 U.S. at 324).

If there is a conflict between the parties' allegations or evidence, the non-moving party's evidence is presumed to

13

be true and all reasonable inferences must be drawn in the non-moving party's favor. Shotz v. City of Plantation, Fla., 344 F.3d 1161, 1164 (11th Cir. 2003). If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, the court should not grant summary judgment. Samples ex rel. Samples v. City of Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988) (citing Augusta Iron & Steel Works, Inc. v. Emp'rs Ins. of Wausau, 835 F.2d 855, 856 (11th Cir. 1988)). However, if the non-movant's response consists of nothing "more than a repetition of his conclusional allegations," summary judgment is not only proper, but required. Morris v. Ross, 663 F.2d 1032, 1034 (11th Cir. 1981).

## III. Analysis

### A. Claim Brought under 42 U.S.C. § 1983

"A government official who is sued under § 1983 may seek summary judgment on the ground that he is entitled to qualified immunity." Crosby v. Monroe Cty., 394 F.3d 1328, 1332 (11th Cir. 2004). Holderbaum seeks qualified immunity in this case.

"Qualified immunity affords complete protection to government officials sued individually," Terrell v. Smith,

14

668 F.3d 1244, 1250 (11th Cir. 2012), except in cases where "the law preexisting the defendant official's supposedly wrongful act was already established to such a high degree that every objectively reasonable official standing in the defendant's place would be on notice that what the defendant official was doing would be clearly unlawful given the circumstances." Pace v. Capobianco, 283 F.3d 1275, 1282 (11th Cir. 2002). Qualified immunity "protect[s] from suit 'all but the plainly incompetent or one who is knowingly violating the federal law.'" Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002) (quoting Willingham v. Loughnan, 261 F.3d 1178, 1187 (11th Cir. 2001)).

"[T]he official must first establish that he was performing a 'discretionary function' at the time the alleged violation of federal law occurred." Crosby, 394 F.3d at 1332 (citation omitted). "To determine whether an official was engaged in a discretionary function, [a court] consider[s] whether the acts the official undertook 'are of the type that fell within the employee's job responsibilities.'" Id. (quoting Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1265 (11th Cir. 2004)). In this case, the parties do not dispute whether Holderbaum was performing a discretionary function at the time of the alleged violation.

The Court follows a two-part analysis in determining whether qualified immunity applies. Vinyard v. Wilson, 311 F.3d 1340, 1346 (11th Cir. 2002). The first part asks "whether [the] plaintiff's allegations, if true, establish a constitutional violation." Id. (quoting Hope v. Pelzer, 536 U.S. 730, 736 (2002)) (internal quotation marks omitted) (alteration in original). The second part asks "whether the right was clearly established." Id. (quoting Saucier v. Katz, 533 U.S. 194, 201 (2001)) (internal quotation marks omitted). Courts have discretion to decide the order in which to address the two parts. Pearson v. Callahan, 555 U.S. 223, 236 (2009). Nevertheless, "[b]oth elements . . . must be satisfied for an official to lose qualified immunity." Grider v. City of Auburn, 618 F.3d 1240, 1254 (11th Cir. 2010).

### 1.   Constitutional-Violation Analysis

Rojo "must establish qualified immunity is not appropriate because the facts when viewed in the light most favorable to him show that [Holderbaum] violated a constitutional right." Benson v. Gordon Cty., 479 Fed. Appx. 315, 317 (11th Cir. 2012) (citing Mercado v. City of Orlando, 407 F.3d 1152, 1156 (11th Cir. 2005)). "At summary judgment, [the Court] cannot simply accept the officer's subjective version of events, but rather must reconstruct the event in

16

the light most favorable to the non-moving party and determine whether the officer's use of force was excessive under those circumstances." Fils v. City of Aventura, 647 F.3d 1272, 1288 (11th Cir. 2011) (citing Vinyard, 311 F.3d at 1347-48 as "evaluating, at summary judgment, the allegedly excessive force under the facts as described by the plaintiff, notwithstanding the defendant-officer's different version of events").

"[A] pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable." Kingsley v. Hendrickson, 135 S. Ct. 2466, 2473 (2015); see also Shuford v. Conway, No. 16-12128, 2016 WL 6820764, at *3-4 (11th Cir. Nov. 18, 2016) (applying Graham v. Connor, 490 U.S. 386 (1989), factors to pretrial detainee § 1983 action) (citing Kingsley, 135 S. Ct. at 2473). The Court has provided a non-exhaustive list of considerations that bear on the reasonableness of force used by a prison official:

> the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

Kingsley, 135 S. Ct. at 2473. In determining reasonableness, a court "look[s] at the fact pattern," McCullough v. Antolini, 559 F.3d 1201, 1206 (11th Cir. 2009), as described by plaintiff, Fils, 647 F.3d at 1288, "from the perspective of a reasonable officer on the scene with knowledge of the attendant circumstances and facts, and balance[s] the risk of bodily harm to the suspect against the gravity of the threat the officer sought to eliminate." McCullough, 559 F.3d at 1206 (citation omitted).

"A court must also account for the 'legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained,' appropriately deferring to 'policies and practices that in th[e] judgment' of jail officials 'are needed to preserve . . .,'" order, discipline, and institutional security. Kingsley, 135 S. Ct. at 2473 (second and third alterations in original, and citation omitted); see also Esposito v. Stone, No. 8:14-cv-2414-T-33EAJ, 2015 WL 5440599, at *5 (M.D. Fla. Sept. 15, 2015) (citations omitted). The reasonableness of the force used must not be judged "with the 20/20 vision of hindsight." McCullough, 559 F.3d at 1206 (quoting Graham, 490 U.S. at 396). Furthermore, a court's "calculus of reasonableness must embody allowance for the fact that police officers are often

forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." Id. (quoting Graham, 490 U.S. at 396-97) (internal quotation marks omitted). And, because "[t]he constitutional test for excessive force is necessarily fact specific," Terrell, 668 F.3d at 1251 (quoting McCullough, 559 F.3d at 1206) (alteration in original), this Court "must still slosh [its] way through the factbound morass of 'reasonableness,'" Id. (quoting Scott v. Harris, 550 U.S. 372, 383 (2007)).

The record before the Court demonstrates that a constitutional violation did not occur when Holderbaum struck Rojo once in the face with a closed fist. From the beginning, Rojo was argumentative with deputies. (Doc. # 46-5, Thorn Depo., at 12:2-7). And, Rojo's argumentativeness turned to noncompliance during his strip search. Specifically, when directed to remove his pants and hand them to Thorn, Rojo dropped his pants on the floor. (Doc. # 46-4, Rojo Depo., at 17:3-11; Doc. # 46-3, Holderbaum Depo., at 19:11-23; Doc. # 46-5, Thorn Depo., at 24:19-25:14). Holderbaum repeated the directive for Rojo to hand his pants to Thorn, and then Rojo complied. (Doc. # 46-4, Rojo Depo., at 17:12-23; Doc. # 46-

3, Holderbaum Depo., at 20:13-20; Doc. # 46-5, Thorn Depo., at 25:15-18).

Rojo's noncompliance then turned from mere passive resistance to active aggression when, after being ordered to remove his boxer shorts, Rojo kicked his boxer shorts at Holderbaum, striking him in the torso, while yelling "fuck you," and taking a step toward Holderbaum. (Doc. # 46-4, Rojo Depo., at 72:17-73:24; Doc. # 46-3, Holderbaum Depo., at 21:3-22:12, 30:24-31:2, 32:1-9, 38:3-7; Doc. # 46-5, Thorn Depo., at 25:2-4, 25:23-27:12). At this stage in the events, it is important that Rojo was unsecured and within close proximity of Holderbaum. (Doc. # 46-4, Rojo Depo., at 18:9-19, 74:12-17).

In reaction, Holderbaum struck Rojo once in the face, pinned him against the cell wall, and, with the aid of other deputies, secured Rojo. (Doc. # 46-3, Holderbaum Depo., at 22:13-20, 23:3-16, 23:22-25:8, 26:18-20; Doc. # 46-5, Thorn Depo., at 27:13-21, 29:8-30:22, 31:8-32:2, 32:17-33:14). Rojo was then examined by the Jail's medical staff, a spit mask was placed on him to prevent blood from being sprayed while Rojo yelled, and Rojo was placed in a prostraint chair. (Doc. # 46-4, Rojo Depo., at 81:4-18; Doc. # 46-3, Holderbaum Depo., at 26:25-27:1, 44:13-18; Doc. # 46-5, Thorn Depo., at 32:9-

20

16,    34:25-35:10,    35:15-20,    37:7-16).    Holderbaum's
interactions with Rojo stopped at that point. (Doc. # 46-3,
Holderbaum Depo., at 44:8-10).

    After balancing the factors set forth in Kingsley, the
Court cannot say a constitutional violation occurred. While
Rojo did suffer a comminuted fracture of his left anterior
maxillary sinus wall, which weighs slightly in favor of Rojo,
a review of the remaining factors leads to the conclusion
that a violation did not occur. Rojo transitioned from passive
noncompliance to active resistance while he was unsecured by
kicking his boxer shorts at Holderbaum, yelling "fuck you,"
and taking a step toward Holderbaum in the process. In
response, Holderbaum delivered a single strike to Rojo's
face. On this record, the Court finds Holderbaum entitled to
qualified immunity because a constitutional violation did not
occur.

    Although the Court has found Holderbaum entitled to
qualified immunity given that Rojo failed to establish a
constitutional violation, the Court also finds itself
compelled to remark on the unfortunate nature of Holderbaum's
decision to punch Rojo, which caused his nose to break. While
the Court in no way condones the force used by Holderbaum and
is confident Holderbaum could have utilized a less violent

alternative to protect himself, that is not enough to defeat qualified immunity under the facts of this case and precedent of the United States Supreme Court and the Eleventh Circuit. See City & Cty. of S.F. v. Sheehan, 135 S. Ct. 1765, 1777 (2015) (plaintiff "cannot establish a Fourth Amendment violation based merely on bad tactics that result in a . . . confrontation that could have been avoided"); Whitley v. Albers, 475 U.S. 312, 320-22 (1986) ("a mere dispute over the reasonableness of a particular use of force or the existence of arguably superior alternatives" cannot support a finding that an officer acted maliciously or sadistically); Wright v. Powell, 296 Fed. Appx. 820, 820 (11th Cir. 2008) ("[W]e emphasize . . . we are loath to second-guess the decisions of police officers . . . who are '"forced to make split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving-about the amount of force that is necessary in a particular situation."'" (quoting Long v. Slaton, 508 F.3d 576, 580 (11th Cir. 2007))) (footnote omitted); Crosby, 394 F.3d at 1333-34 ("In making an excessive force inquiry, we are not to view the matter as judges from the comfort and safety of our chambers, fearful of nothing more threatening than the occasional paper cut as we read a cold record accounting of what turned out to be the facts. We must see

the situation through the eyes of the officer on the scene who is hampered by incomplete information and forced to make a split-second decision between action and inaction . . . ."); Rodriguez v. Farrell, 280 F.3d 1341, 1350 (11th Cir. 2002) ("Public officers need not err on the side of caution."); Brown v. Smith, 813 F.2d 1187, 1189-90 (11th Cir. 1987) ("[A] 'mere dispute over the reasonableness of the particular use of force' . . . could not support 'a reliable inference of wantonness in the infliction of pain.'").

As another judge colloquially summarized binding precedent as to how a court reviews the facts in deciding whether to grant or deny qualified immunity, "[i]t is of paramount importance that a reviewing court . . . refrain from slipping into the role of Monday-morning quarterback . . . . Fernandez v. City of Cooper City, 207 F. Supp. 2d 1371, 1377 (S.D. Fla. 2002) (citation omitted). Thus, while the Court must express its disappointment with Holderbaum's reaction, given the standard at this stage in the proceedings and the fact that Rojo stepped toward Holderbaum while yelling an expletive and kicking his boxer shorts at Holderbaum in close proximity thereto, the Court nevertheless finds Holderbaum entitled to qualified immunity. Furthermore, as explained below, even if a constitutional violation did

occur, Holderbaum would still be entitled to qualified immunity because Rojo failed to satisfy the second prong of the analysis.

## 2.   Clearly-Established Analysis

Under this prong, Rojo "must also show that the right involved was clearly established at the time of the putative misconduct." Benson, 479 Fed. Appx. at 317 (quoting Terrell, 668 F.3d at 1250) (internal quotation marks omitted). Before continuing, the Court notes that, "[w]hile Kingsley's objective unreasonableness standard governs the existence of a constitutional violation, that decision was issued after the [alleged violation] took place, so it plays no part in [the Court's] determin[ation of] whether the unlawfulness of [Holderbaum's] conduct was clearly established at the time it occurred." Jacoby v. Baldwin Cty., No. 14-12773, 2016 WL 6575054, at *5 (11th Cir. Nov. 7, 2016) (citing Belcher v. City of Foley, 30 F.3d 1390, 1400 n.9 (11th Cir. 1994)). "Instead, in order to determine whether the clearly established requirement is met in this case, [the Court] look[s] to pre-Kingsley case law, which applied the old 'sadistic or malicious' standard for excessive force." Id.

"The violation of a constitutional right is clearly established if a reasonable official would understand that

24

his conduct violates that right." Bussey-Morice v. Gomez, 587
Fed. Appx. 621, 627 (11th Cir. 2014) (citing Coffin v.
Brandau, 642 F.3d 999, 1013 (11th Cir. 2011) (en banc)).
"'[T]he salient question . . . is whether the state of the
law' at the time of an incident provided 'fair warning' to
the defendants 'that their alleged [conduct] was
unconstitutional.'" Tolan v. Cotton, 134 S. Ct. 1861, 1866
(2014) (quoting Hope, 536 U.S. at 741) (alterations in
original). "[T]he touchstone of qualified immunity is
notice." Bussey-Morice, 587 Fed. Appx. at 627 (citing Holmes
v. Kucynda, 321 F.3d 1069, 1078 (11th Cir. 2003)).

The Eleventh Circuit has established two methods for
determining whether the right in question was clearly
established at the time of the alleged misconduct. Fils, 647
F.3d at 1291. Under the first, "decisions of the United States
Supreme Court, the United States Court of Appeals for the
Eleventh Circuit, and the highest court of the pertinent state
(here, the Supreme Court of Florida) can clearly establish
the law." McClish v. Nugent, 483 F.3d 1231, 1237 (11th Cir.
2007) (citing Marsh v. Butler Cty., Ala., 268 F.3d 1014, 1032
n.10 (11th Cir. 2001) (en banc)).

Under the first method, the Court looks at the relevant
case law at the time of the violation; the right in question

25

is "clearly established if 'a concrete factual context [exists] so as to make it obvious to a reasonable government actor that his actions violate federal law.'" Fils, 647 F.3d at 1291 (quoting Hadley v. Gutierrez, 526 F.3d 1324, 1333 (11th Cir. 2008)) (alteration in original). The cases need not be "materially similar" to the officer's conduct. Id. "But, where the law is stated in broad propositions, 'a very high degree of prior factual particularity may be necessary.'" Id. (quoting Hope, 536 U.S. at 740-41).

The second method, termed the obvious-clarity method, "involves evaluating the officer's conduct and deciding whether the officer's conduct lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to [the officer], notwithstanding the law of fact-specific case law on point." Bussey-Morice, 587 Fed. Appx. at 627 (quoting Fils, 647 F.3d at 1291) (alteration in original) (citation and internal quotation marks omitted). This method "recognizes that although concrete facts are typically necessary to provide an officer with notice of 'the hazy border between excessive and acceptable force,' when an officer's conduct is 'so outrageous that it clearly goes "so far beyond" these

26

borders, qualified immunity will not protect him . . . .'"
Id. (quoting Fils, 647 F.3d at 1291-92).

The obvious-clarity method "offers a narrow exception to the general rule that only case law and specific factual scenarios can clearly establish a constitutional violation," however, it "is a difficult one to meet." Id. at 627-28. Nevertheless, "qualified immunity will be denied if the preexisting law '[made] it obvious that the defendant's acts violated the plaintiff's rights in the specific set of circumstances at issue.'" Montero v. Nandlal, 597 Fed. Appx. 1021, 1026 (11th Cir. 2014) (quoting Youmans v. Gagnon, 626 F.3d 557, 563 (11th Cir. 2010)).

Rojo attempts to carry his burden under the clearly-established prong by arguing, "[a]t the time of the incident in 2011, it was already clearly established that the use of force on a non-resisting person is excessive." (Doc. # 48 at 11). In support of his argument, Rojo cites to several Eleventh Circuit cases; however, each case is distinguishable. To be sure, each case cited by Rojo involved a non-resisting or compliant suspect. See Brown v. City of Huntsville, Ala., 608 F.3d 724, 739 (11th Cir. 2010) (reversing grant of qualified immunity where plaintiff was not resisting and in the act of complying with officer's

directive to exit vehicle when the officer pushed the plaintiff back into the car and pepper sprayed her); Hadley, 526 F.3d at 1330 (concluding single punch constituted excessive force where plaintiff was not struggling or resisting); Vinyard, 311 F.3d at 1347-49 (reversing grant of qualified immunity where officer used pepper spray after plaintiff was yelling profanities at the officer from the backseat of a patrol car while handcuffed and separated from the officer by a glass partition). But, the record reflects that Rojo had, up until the point of Holderbaum's use of force, been intermittently noncompliant to varying degrees. In addition, the record demonstrates Rojo was aggressively noncompliant by kicking his boxer shorts at Holderbaum while yelling "fuck you," and taking a step toward Holderbaum.

Furthermore, Rojo's argument that a genuine issue of material fact exists regarding whether Rojo "intended to threaten Defendant Holderbaum" by kicking his boxer shorts at him, is unpersuasive. The analysis at the qualified-immunity stage does not turn on a suspect's or inmate's intention; rather, the Court views the facts in a light most favorable to the plaintiff from the viewpoint of the officer on the scene. Thus, Rojo's unarticulated intention, even if disputed, is not material.

B.   <u>State-Law Claims</u>

Having found that Holderbaum is entitled to qualified immunity on Count I, the Court, in its discretion, declines to exercise supplemental jurisdiction over the remaining state-law claims, Counts II and III. <u>See</u> 28 U.S.C. § 1367(c)(3). Accordingly, Counts II and III are dismissed without prejudice. <u>See</u> <u>Hicks v. Moore</u>, 422 F.3d 1246, 1255 n.8 (11th Cir. 2005) (citing <u>United Mine Workers of Am. v. Gibbs</u>, 383 U.S. 715, 726 (1966) (stating, "[c]ertainly, if the federal claims are dismissed before trial, . . . the state claims should be dismissed as well"); <u>Raney v. Allstate Ins. Co.</u>, 370 F.3d 1086, 1088-89 (11th Cir. 2004) (stating, "[t]he decision to exercise supplemental jurisdiction over pendant state claims rests within the discretion of the district court. We have encouraged district courts to dismiss any remaining state claims when, as here, the federal claims have been dismissed prior to trial.")).

Accordingly, it is

**ORDERED, ADJUDGED,** and **DECREED:**

(1)   Defendants Sergeant Scott Holderbaum and Sheriff Bob Gualtieri's Motion for Summary Judgment (Doc. # 46) is **GRANTED** as to Count I of the Amended Complaint.

(2)   Counts II and III of the Amended Complaint are **DISMISSED WITHOUT PREJUDICE.**

(3)   The Clerk is directed to enter judgment in favor of Defendant Sergeant Scott Holderbaum, and against Plaintiff Mario Rojo. Thereafter, the Clerk shall **CLOSE THIS CASE.**

    **DONE** and **ORDERED** in Chambers in Tampa, Florida, this 7th day of December, 2016.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE